DAVIDOFF HUTCHER & CITRON, LLP
*Attorneys for the Debtors*
120 Bloomingdale Road, Suite 100
White Plains, New York 10605
(914) 381-7400
Robert L. Rattet, Esq.
Jonathan S. Pasternak, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
In re:

CONTEMPORARY MANAGEMENT                    Lead Case No. 23-22459 (SHL)
SERVICES LLC, ET Al.,[1]                              (Jointly Administered)


                          Debtors.
-----------------------------------------------------------------------X

### DEBTORS' OBJECTION TO THE APPOINTMENT OF A PATIENT CARE OMBUDSMAN

**TO:  THE HONORABLE SEAN H. LANE,
       UNITED STATES BANKRUPTCY JUDGE:**

The above-captioned debtors and debtors-in-possession (the "**Debtors**"), by their attorneys, Davidoff Hutcher & Citron LLP, as and for their Objection to the Motion (the "**Motion**") filed by the Office of the United States Trustee seeking the appointment of a patient care ombudsman ("**PCO**"), together with the supporting Declaration of Dale D. Goldschlag, D.D.S. submitted herewith as Exhibit "A" ("**Goldschlag Declaration**") respectfully state as follows:

### PRELIMINARY STATEMENT

1.  The Debtors maintain that each of the Debtors are not a "health care business" within the meaning of section 101(27A) of the Bankruptcy Code and as such, the appointment of

---

[1] Jointly administered with Dale D. Goldschlag D.D.S. P.C., d/b/a Contemporary Dental Implant Centre® (**-***6832), CDIC Holdings, LLC (**-***8684), Refined Dental Laboratory, LLC (**-***7644), and Total Dental Implant Solutions, LLC (**-***8229).

a PCO is not required. However, to the extent that the Court finds otherwise, the Debtors assert that the appointment of a PCO is still not warranted at this time because (a) all of the Debtors are managerial, staffing, and suppliers, other than Dale D. Goldschlag, D.D.S. P.C., which no longer directly provides any dental services at this time, (b) The Debtors do not render any patient care services, nor is there evidence that the quality of patient care and preservation of patient privacy by the independent contractor dentists is, or has been, compromised in any way, and (c) in light of the lack of historical problems warranting patient oversight, the cost of an ombudsmen in these Chapter 11 cases would be burdensome and detrimental to the estates.

## **OBJECTION**

I. A PATIENT CARE OMBUDSMAN SHOULD NOT BE APPOINTED BECAUSE THE DEBTORS ARE NOT HEALTHCARE BUSINESSES

2. The Debtor, Contemporary Management Services, LLC ("**CMS**"), is a management company that provides management services to certain of the other Debtors, including Dale D. Goldschlag D.D.S. P.C. ("**DDG PC**") and various non-debtor entities, including non-debtor affiliate Manhattan Dental Implant Solutions P.C. ("**MDIS PC**"). CMS manages the back-office, non-doctor staff, call centers, equipment and other supplies, scheduling of patients, marketing and all of the non-clinical work of the dental practices. CMS maintains bank accounts in which it collects fees for managing DDG PC and other non-debtor entities like MDIC PC.

3. DDG PC which operates under the trade name Contemporary Dental Implant Centre®, is a professional corporation through which a New York based dental practice is operated. MDIS PC is a non-debtor affiliate which operates under the trade names Elite Dental Implants® as well as Contemporary Dental Implant Centre®, is likewise a professional corporation through which a New York based dental practice is operated.

4. Refined Dental Laboratory LLC ("**Refined Dental**") fabricated the crowns used by

2

the professional corporations when servicing patients. It owns certain inventory and finances certain equipment all presently housed at the laboratory facility in Valley Stream, NY.

5.     Total Dental Implant Solutions LLC ("**Total Dental**"), which did business as Genicore®, is a medical device company specializing in dental implants. It has historically sold CT scans and dental implants. I own 60% of Total Dental, with the remaining 40% owned by two individuals; my nephew Ariel Goldschlag owns 20% and Aurel Romanovic owns 20%.

6.     CDIC Holdings LLC ("**CDIC**") is a real estate entity and exists as the counterparty to a majority of the leases from which each dental office operates. It also owns much of the assets and value associated with the buildouts for such leased locations.

7.     Overall, the Debtors do not make clinical decisions for patient care, but rather work with independent contractor dentists who operate under their own professional organizations. Typical dental implant cases for these dentists have a duration of 3 to 5 months. Those dentists have a legal obligation to complete their work in progress. Patients typically pay a bundle fee up front for the contemplated care at the outset of their arrangement with the medical providers.

8.     Each of the Debtors is not a healthcare business within the definition of § 101(27A) because each merely provide managerial services, do not render any patient care services, and any of the alleged health care services associated with the Debtors are instead provided by third party, non-debtor, independent contractor dentists, with their own insurance and patient care standards. Section 101(27A) provides:

> (27A) The term "health care business"-- (A) means any public or private entity (without regard to whether that entity is organized for profit or not for profit) that is primarily engaged in offering to the general public facilities and services for--
>     (i) the diagnosis or treatment of injury, deformity, or disease; and
>     (ii) surgical, drug treatment, psychiatric, or obstetric care; and
> (B) includes--
>     (i) any--
>     (I) general or specialized hospital;

3

>    (II) ancillary ambulatory, emergency, or surgical treatment facility;
>    (III) hospice;
>    (IV) home health agency; and
> (V) other health care institution that is similar to an entity referred to in subclause (I), (II), (III), or (IV); and
>    (ii) any long-term care facility, including any--
>    (I) skilled nursing facility;
>    (II) intermediate care facility;
>    (III) assisted living facility;
>    (IV) home for the aged;
>    (V) domiciliary care facility; and
> (VI) health care institution that is related to a facility referred to in subclause (I), (II), (III), (IV), or (V), if that institution is primarily engaged in offering room, board, laundry, or personal assistance with activities of daily living and incidentals to activities of daily living.

11 U.S.C. § 101(27A).

9. To be considered a healthcare business under section 101(27A), a debtor must meet the requirements of both subsection (A) and subsection (B), because the subsections are connected with the conjunctive "and." *See In re Banes*, 355 B.R. at 534–35 ("Because every section of this statute is connected by the conjunctive, a health care business must meet the requirements of every subsection […]"); *See In re Saber*, 369 B.R. 631, 636 (Bankr. D. Colo. 2007) ("[…] a debtor who is a 'health care business' must meet every requirement under both subsections for a patient care ombudsman to be appointed.").

10. To fall under subsection (A), a healthcare business must be "primarily engaged" in offering "(i) the diagnosis or treatment of injury, deformity, or disease; and (ii) surgical, drug treatment, psychiatric, or obstetric care" to the general public. 11 U.S.C. § 101(27A) (A). Here, none of the Debtors fall under subsection (A) because none of them render healthcare services to patients.

11. To fall under subsection (B), a healthcare business must be one of the type enumerated in the subsection, which focuses primarily on facilities that maintain "'direct and

4

ongoing contact with patients'" and provide "'shelter and sustenance in addition to medical treatment.'" 11 U.S.C. § 101(27A)(B); *see In re Banes*, 355 B.R. at 536 quoting *In re 7-Hills Radiology, Inc.*, 350 B.R. 902, 905 (Bankr D. Nev. 2006). While the list contained in subsection (B) is non-exhaustive, the nature of the businesses listed in the subsection all share the characteristic of providing treatment as well as temporary shelter, rendering the Debtors' managerial practice unlikely to be categorized in the subsection. *See In re Banes*, 355 B.R. at 536 ("the types of businesses listed are all of such a similar nature in that they provide both housing and treatment, that it is difficult to imagine that the legislature would have intended a business that is so fundamentally different, such as an outpatient dental practice, to be read into the definition."); see also *In re Med. Assocs. of Pinellas*, L.L.C. 360 B.R. 356, 361 ("[…]the legislative history relating to efforts […] to amend the Bankruptcy Code to address patient care issues appears consistent with the concept that a health care business was intended to refer to inpatient care facilities such as hospitals and nursing homes and not most outpatient facilities such as a doctor's office.").

12.     Here, none of the Debtors provide health care services. Only DDG PC contracts with independent dentists in ambulatory facilities, but in any event, these independent dentists only provide outpatient services. Additionally, the Debtors do not provide shelter and sustenance to the independent dentists' patients, and thus none of the Debtors can be considered a healthcare business. *See Id.* (finding a Debtor's dental practice was "plainly not within the range of health care businesses" anticipated by section 101(27A) because it "does not provide patients with shelter and sustenance in addition to medical treatment.").

5

II.     <u>A PCO IS NOT WARRANTED BECAUSE THERE IS NO INDICATION THAT PATIENT CARE OR PRIVACY IS AT ISSUE</u>

13.     Even if any of the Debtors were considered a healthcare business within the definition of section 101(27A) of the Bankruptcy Code, which the Debtors do not concede, there are no historical or existing circumstances which warrant the appointment of a PCO. Section 333(a)(1) of the Bankruptcy Code provides, in relevant part:

> If the debtor […] is a health care business, the court shall order, not later than 30 days after the commencement of the case, the appointment of an ombudsman to monitor the quality of patient care and to represent the interests of the patients of the health care business **unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case**.

11 U.S.C. § 333(a)(1) (emphasis added). As such, the plain language of the statute permits the Court, in its discretion, to determine if in fact a PCO is warranted. *See In re North Shore Hematology-Oncology Assoc., P.C.* 400 B.R. 7, 11-12 (Bankr. E.D.N.Y. 2008) *citing In re Valley Health Sys.*, 381 B.R. 756, 761 (Bankr. C.D. Cal. 2008).

14.     To determine whether it is necessary to appoint a PCO, courts typically consider the following factors, first articulated by the bankruptcy court in *In re Alternate Family Care*:

> (1) the cause of the bankruptcy; (2) the presence and role of licensing or supervising entities; (3) debtor's past history of patient care; (4) the ability of the patients to protect their rights; (5) the level of dependency of the patients on the facility; (6) the likelihood of tension between the interests of the patients and the debtor; (7) the potential injury to the patients if the debtor drastically reduced its level of patient care; (8) the presence and sufficiency of internal safeguards to ensure appropriate level of care; (9) the impact of the cost of an ombudsman on the likelihood of a successful reorganization.

*In re Alternate Family Care*, 377 B.R. 754, 758 (Bankr. S.D. Fla. 2007); *In re North Shore Hematology-Oncology Associates, P.C.*, 400 B.R. 7, 11 (Bankr. E.D.N.Y. 2008); 3 *Collier on Bankruptcy* ¶ 333.02[2] (16th ed.).

15. The weight given to each of the above nine factors is at the discretion of the bankruptcy court. *In re North Shore Hematology-Oncology Associates, P.C.*, 400 B.R. at 11. Other factors courts have considered are: (1) the high quality of the debtor's existing patient care; (2) the debtor's financial ability to maintain high quality patient care; (3) the existence of an internal ombudsman program to protect the rights of patients, and/or (4) the level of monitoring and oversight by federal, state, local, or professional association programs which renders the services of an ombudsman redundant. *Id. citing In re Valley Health Sys.*, 381 B.R. at 762.

16. Some courts that have declined to appoint a PCO have done so in cases with similar facts to those present here, including where a debtor has no history of providing deficient patient care; does not provide inpatient care; has filed bankruptcy for reasons not related to deficient patient care, and; where appointing a PCO would adversely affect the debtor's ability to reorganize. *See* e.g., *In re North Short Hematology-Oncology Associates, P.C.,* 400 B.R. at 12; *In re Mississippi Maternal-Fetal Medicine, P.A.,* 2021 WL 1941627, *3-4 (Bankr. S.D. Miss. 2021); *In re Smiley Dental Arlington PLCC*, 503 B.R. at 689; *see also In re Valley Health Sys.*, 381 B.R. at 764; *see also In re Saber*, 369 B.R. at 638. Here, as set forth below, the analysis of the nine-factor test weighs heavily in favor of a finding that a PCO is not necessary in the Debtors' case.

*Factor (1): The cause of the bankruptcy.*

17. The first factor of the *Alternate Family Care* test, "the cause of the bankruptcy," weighs against appointing a PCO because the Debtors' bankruptcy filings are not related to deficient patient care. *See generally* Local Rule 1007-2 Declaration of Dale D. Goldschlag, D.D.S.,

7

ECF No. 2 (the "**1007 Dec**."); *In re Alternate Family Care*, 377 B.R. at 758. Rather, the Debtors' bankruptcy is a result of reduced operations and cash flow caused by the Covid-19 Pandemic and later exacerbated by aggressive merchant cash advance lenders. *See* 1007 Dec. at ¶ 7. The Debtors do not provide patient care. *Id.* There is no indication that there has been any reduction in patient care or privacy for any reason whatsoever, including financial. *See generally Goldschlag Declaration,*; See *In re Smiley Dental Arlington PLCC*, 503 B.R. at 689 (finding affiliated dental clinic debtors satisfied the burden to show a PCO was not necessary in large part because the bankruptcy was caused by "cash flow problems resulting from changes to Medicare reimbursement practices for orthodontics."); *In re Saber*, 369 B.R. at 637 (finding that a PCO was not necessary where the bankruptcy was precipitated by the entry of a state court judgment in relation to a contractual employment dispute rather than patient care); *In re Total Women Healthcare Center, P.C.*, 2006 WL 3708164 (Bankr. M.D. Ga. 2006) (finding a PCO not necessary where the Debtor's obligations in bankruptcy arose from tax liability rather than deficient patient care).

18. Thus, factor (1) weighs against appointing a PCO.

***Factor 2: The presence and role of licensing or supervising entities.***

19. All of the dentists that work for the Debtors are independent third-party contractors and are not related to the Debtors or these Chapter 11 Cases, however upon information and belief they are all properly insured, licensed, and trained as required under proper authority. See *Goldschlag Declaration,* Sec. II. DDG PC contracts with dentists and usually their corporations, which solely provide any and all patient care. *Id.* The independent dentists have full clinical autonomy, and DDG PC nor any of the other Debtors in these proceedings are involved with insurance for patients or the doctor and their corporations on the liability side. *Id.* The presence

8

and role of these licensing agencies for the independent dentists weighs against appointing a PCO. *See In re Alternate Family Care*, 377 B.R. at 758; *In re Smiley Dental Arlington PLCC*, 503 B.R. at 689 (up-to-date licenses and insurance coverage in accordance with state requirements weigh against the appointment of a PCO).

20. Thus, factor (2) weighs against appointing a PCO.

***Factors (3) & (4): The Debtors' past history of patient care; the ability of patients to protect their rights.***

21. The Debtors have no history of compromised patient care or rights, as they do not provide patient care. See *Goldschlag Declaration,* generally. The Debtors have operated for over 10 years in good standing and Dr. Goldschlag, its president for over 20 years. *Id.* at ¶4. There have been no pending or recent malpractice suits filed against any of the Debtors or recent or pending complaints relating to deficient patient care. *Id.* at ¶ 11. Upon information and belief, the independent dentists' customers are fully informed about their treatment plan and their rights and have avenues both within and without the dentists' organizations to voice questions or concerns if any exist. *Id.* at Sec. IV.

22. Thus, factors (3) and (4) weigh against appointing a PCO.

***Factor 5: the patients' level of dependency on the Debtors.***

23. The fifth factor is largely inapplicable to the Debtors given that none of them render health care services to patients and the independent contractor dentists in privity with DDG PC are entirely outpatient providers. As such, there is little to no dependency on the Debtors by the patients of the independent dentists in the way factor 5 implies. *See In re Mississippi Maternal-Fetal Medicine, P.A.*, 2021 WL 1941627 (Bankr. S.D. Miss. 2021) ("The risk to patient care is lessened further by the Debtor's role in only providing outpatient care instead of a continuity of

9

day-to-day care."); *see also In re Genesis Hospice Care LLC*, *No.*, 2009 WL 467265, at *2 (Bankr. N.D. Miss. Feb. 24, 2009) (stating the need for a PCO is lessened where a debtor provides only outpatient care); *In re North Shore Hematology-Oncology Associates, P.C.*, 400 B.R. 7, 12 (Bankr. E.D.N.Y. 2008) (stating "[t]he fact that Debtor does not provide any inpatient services at any of its facilities holds substantial significance in this Court's decision."); *see also In re Smiley Dental Arlington PLCC*, 503 B.R. at 689 (finding a low level of provider dependency where dental patients have access to their medical records and the nature of a dental clinic is such that a patient may "seek alternate dental or orthodontic care" if he or she so chooses).

24. Thus, factor (5), to the extent that it is applicable, weighs against appointing a PCO.

***Factors (6) & (7): The likelihood of tension between the interests of the patients and the Debtors; the potential injury to the patients if the Debtors drastically reduced their level of patient care.***

25. There is a low likelihood of tension between the interests of the patients of the independent dentists and the Debtors because the Debtors did not file bankruptcy as a result of deficient patient care or the ability to pay vendors and suppliers who are critical to patient care. *See In re Smiley Dental Arlington PLCC*, 503 B.R. at 689 (stating "[b]ecause malpractice does not appear to have caused the bankruptcy, no likelihood of tension between the interests of the patients and Debtors appears to exist."); *In re Alternate Family Care*, 377 B.R. at 758.

26. Factor (7) asks courts to consider the potential injury to the patients if the debtor drastically reduced its level of patient care. *In re Alternate Family Care*, 377 B.R. at 758. Courts typically find this factor to weigh in favor of appointing a PCO where the debtor is a long-term care facility or hospital that performs a high volume of inpatient procedures. *See In re Valley Health Sys.*, 381 B.R. at 764 (court found that factor (7) weighed in favor of appointing a PCO due to the nature of the debtor's services, including inpatient surgeries, critical care, and specialized

10

eye surgery; and the fact that a "cessation of operations at one of the debtor's hospitals would require a transfer of patients to another facility.") Here, only DDG PC's independent contractor dentists provide dental services that involve only local anesthesia on occasion, require little to no recovery time for patients, and do not require patients to remain at the clinic overnight or even for extended periods of time for observation. Therefore, there is no effect to patient care, and it would not have the requisite effect needed to sway this factor in favor of appointing a PCO.

27. Thus, factors (6) and (7) weigh against appointing a PCO.

***Factor (8): The presence and sufficiency of internal safeguards to ensure appropriate level of care.***

28. As set forth in detail in the Goldschlag Declaration, the Debtors do not render health care services to patients. Upon information and belief, there are sufficient internal safeguards in place by the independent dentists and their organizations. *See Goldschlag Declaration*, at ¶¶ 9, 10.

29. Thus, factor (8) weighs against appointing a PCO.

***Factor (9): the impact of the cost of an ombudsman on the likelihood of a successful reorganization.***

30. The Debtors are a small business, and as such, its cash flow is often strained. This strain is exacerbated by Chapter 11 which carries with it its own administrative costs, modest though they may be, which are unavoidable including counsel and Subchapter V Trustee. What available disposable income the Debtors have should be allocated to the Debtors' creditors on account of their allowed claims, as opposed to the costs associated with an ombudsman whose services, in this case and at this time, are not warranted. *See In re Saber*, 369 B.R. at 638 (stating that, in a case with a debtor who operated a small business, "although no testimony was elicited regarding the potential expenses associated with the appointment of a patient care ombudsman,

11

the Court is concerned the costs involved […] could preclude this debtor from reorganizing […].""). See also *In re Aknouk*, 648 B.R. 755, 766 (Bankr. S.D.N.Y. 2023) (stating "The additional cost of a Patient Care Ombudsman could eat into these small margins and be the difference between a cash flow positive and negative business.")

31. Thus, factor (9) weighs against appointing a PCO.

III. CONCLUSION

32. For the reasons set forth herein as well as those detailed in the Goldschlag Declaration, the Debtors submit that the appointment of a PCO is not warranted in this case. There is no evidence to suggest that patient care and/ or patient privacy are at risk. To the extent that circumstances should chance in the future, the Court can always reexamine the appropriateness of an appointment. However, at present, the Debtors are operating in a responsible, effective and compliant manner and should be given every opportunity to preserve their precious resources so that they can be utilized in connection with a successful reorganization and emergence from Chapter 11.

**WHEREFORE,** the Debtors respectfully request that the Court deny the Motion, together with such other and further relief as is just and proper under the circumstances.

Dated: White Plains, New York
       July 27, 2023

DAVIDOFF HUTCHER & CITRON LLP
*Attorneys for the Debtors*
120 Bloomingdale Road, Suite 100
White Plains, New York 10605
Tel: (914) 381-7400

By: */s/ Jonathan S. Pasternak*
    Jonathan S. Pasternak